Ms. Pollock, may it please the court and counsel. I'm Elizabeth Pollock. I'm with the Federal Defender's Office for the Central District of Illinois, and I'm here today on behalf of the appellant Joseph Olivo. This case involves the affidavit accompanying a search warrant to search a residence. And admittedly, it is a daunting task for a defendant to challenge the validity of a search warrant on the basis that the confidential source who informed the facts for the warrant was unreliable or that the investigation was insufficient. However, in this case, where the search was of a residence and where the only facts established in the affidavit were from a confidential source, it bears scrutiny by this court. And in this case, I don't think the government has disputed that the facts in the search warrant affidavit came directly from a confidential source and from no one else. That confidential source, his statements were not corroborated in any sufficient way to constitute probable cause. I believe the only two statements that were corroborated by him was the location of the residence and the fact that he knew somehow, although we're not sure how, about the individual's name and the fact that he had a drug prior. But the remaining evidence, there was nothing in the search warrant affidavit stating where he got that from. There was no verification of the personal knowledge therefrom. Did the police corroborate through another CI that the first CI was, in fact, engaged in marijuana distribution for O? That's kind of a confusing question. And when I read the search warrant affidavit, there is a mention of confidential source number 230. And I think if you look at the – there's actually a motion for a Franks hearing also in this case, which was accompanied by a piece of paper, a yellow pad, that Mr. Olivo wrote on. And in that yellow piece of paper, he says that the police – what he believes is that the police and this confidential source 230 and then the driver were in the same vehicle at the time that the driver was arrested. And so we don't really know a lot about that person. That person seemed to have provided evidence about the driver, that the driver was involved in a marijuana distribution operation. But there's no personal knowledge as to O or his involvement. Well, there's no Franks issue before us. That's correct. Okay. No, that was the place where that was – that information was located in the record. No, we are not challenging the denial of a Franks hearing. But the – this – the allegations – But I'm looking at paragraph – this is in paragraph 6 of the affidavit, where confidential source 12-030 indicated that the driver was selling large amounts of marijuana in Elkhart County. The CS is reliable and accurate. The driver was obtaining his marijuana from O. O had been arrested in Elkhart County for drug offenses and on and on, indicating an independent effort to corroborate the first CI's basis for knowledge as a regular distributor for O. I understand what you're reading in the paragraph. I just don't have enough information about that confidential source to know when that took place, where that personal knowledge came from. If they were truly in the same car at the same time and making statements together, it's likely that they were working together. And still, in an investigation of this size, where we're talking about pounds and pounds going back and forth between Texas and Illinois over a great period of time, and this is one of the confusing things about the investigation to me, is that this is not something that had to be done in 24 hours. This is the type of thing where if you're taking a confidential source at his or her word, then you want to confirm what that person is saying. And this is a case where there was no independent surveillance conducted. There were no wiretaps attempted. There were no confidential deals attempted. It is coming from a confidential source on one day and then immediately going in to request the search warrant. And the agent who was responsible for the affiant in this case was actually the head of the Interdiction and Covert Enforcement Unit, which says to me that he participates regularly in undercover operations, and so it didn't ever make sense why they didn't try to further corroborate this information before they just went in and put everything into the search warrant. So on the whole, apart from the statements of a confidential source, there really wasn't anything else there. They tried to go to the residence. They were unable to confirm that the individual, that the suspect rented the house. They were unable to confirm anybody who lived there. They did try to run a search on the property that came back as belonging to somebody who lived in Nashville, Tennessee. They tried to run a search on the vehicle license plates that were in the driveway. It came back to somebody from a different town, a woman. So they tried very briefly just to confirm some of the facts and were unable to do so on that basis. So the statements are, they're conclusory, and on the face, it does look like there's a lot of detail in there, but when you look at the underlying facts, you don't know where that came from, and it requires something more from a confidential source than just conclusory statements without any further investigation, and so that is the primary basis for challenging the probable cause in the search warrant. Now, even if we get there, we still have the issue of whether or not you can get around the good faith reliance of the officer, which is, again, it's a really uphill battle for any defendant, but based on the experience of this officer who was a captain, he had almost 20 years of law enforcement experience, he was head of the covert unit that did these undercover investigations. Do we apply a sliding scale under Leon based on levels of experience? I don't know if you can provide a sliding scale on that basis, but I think certainly his own personal facts, because it's his reasonable reliance that we're talking about, and so facts about the officer. It's subjectively reasonable reliance, isn't it? But there's always a subjective component when you're looking at that person. Okay, so does it matter? Let's suppose he's a rookie. I think if he's a rookie, then a mistake would be more understandable for sure, but this gentleman had a lot of experience, and especially with regards to covert investigations. So we're looking at what he thought the affidavit meant objectively with a person for his experience, and I think that on that basis, then, yes, more should have been expected of him. Well, I don't know. We look at a lot of search warrants. The level of detail that he provided is really, I thought, way more than adequate, and the corroboration showing in the photo, showing in the photo of the resident, and he was talking about in the affidavit how much marijuana was there at the time and that other individuals are, you know, because part of the rationale, because one of your issues is why didn't they wait, why didn't they do wiretaps, why didn't they do these other things. He talks about how other people are coming in to buy and get the marijuana out, so perhaps they wanted to maximize and get as much as they could of the stash at the time, and then when going to this other informant to corroborate, and also on the background of the suspect, oh, I don't know, I don't have the same concerns you have over the affidavit. I understand that, Your Honor. That being said, though, our position would be that because the confidential source did not provide the basis for his knowledge and because the trained officer should have known that, then the conviction should be reversed. What's missing in essence was, and I saw all this in the house yesterday, right? Well, that's not established either. No, no, no. I mean, that's what it would take under your theory. Well, not even that, but just how did he know? How did he know? He didn't have to have been in the house and said, I know this is here because of this, but how did he know? It could be rumor on the street. It could be anybody saying something to him. We don't know how he knew that, and because of that, that is a concern. If it were rumor on the street, we'd have a very different case. I understand. Thank you, Your Honor. Okay. Mr. Grimmer. Good morning, Your Honors. William Grimmer on behalf of the United States. When I first had an opportunity to look at this particular affidavit, I was struck by the amount of detail provided by the informant, and I know that counsel cited in her brief a couple of cases, the Peck case, and I'm not sure how to pronounce this, the Miketuka. Nobody knows how to pronounce it. Okay. And in terms of looking at what was present in those particular cases, because I believe the analogy was made that this is a closer case to those particular cases than perhaps some of the ones that the government is relying on, Cerchi or Garcia, I believe that there is a dramatic difference. First of all, let me talk about urgency. I believe that in terms of the affidavit itself, there is some reference to the fact that there was an individual from Texas who was there overseeing the loads and was scheduled to leave, I believe, on September 21st. The traffic stop here was actually on September 20th. When the police went out and tried to corroborate some of the information from the informant, one of the officers saw tire tracks leading to the back of the residence that was described to them. So in terms of some urgency, would it have been better if they could have done a long-term investigation? I don't know the answer to that because they didn't, at that particular point, the officers thought that they had enough information to go before an issuing judge. Now the question is, did the issuing judge have, based upon what was contained in the affidavit, a fair probability that there was going to be evidence of a crime? When I looked at the cases that this court has relied on in terms of saying there's just not enough there and using the test, the four-part or five-part test that has been employed, there's no dispute here that the informant, the driver of the vehicle, did not appear in front of the issuing judge. So we're left with those four other factors. And really, the cases that I've read, this court really comes down hard on the issue of probable cause when the police don't corroborate or make an attempt to corroborate or the informant does not provide specific details. So going back and preparing for argument, I said, all right, let me count the ways in which I believe there were specific details. Because I thought when I saw the affidavit that it was fairly specific. Now I came up with about 25 different points in terms of specific details. This particular individual indicates, I believe, in the affidavit, paragraph 3, that he actually works for Joseph Olivo. And the question comes up as to, well, he was there prior to being stopped. And I guess Judge DiGiulio said that that was relatively recent. And when you take and look at the affidavit, it is a reasonable inference that before the issuing judge that, in fact, that the informant had been there very recently, in the very recent past. There's not really necessarily a bright line test. And this court has said sometimes 24, 48, 72, and even up to 10 days. We're not in a situation where we're talking about an affidavit that talks about something that happened three months ago. It is relatively recent. Then I asked myself, okay, what about cooperation? Did the police make an effort to cooperate what, in fact, was being told? And I, again, counted about 10 different things that the police tried to do in a relatively short period of time. And I can list some of those, although I believe Judge Williams, you've already mentioned some of those. But certainly they showed a picture of Olivo to the informant. They corroborated the criminal history of Olivo. They got the direction from him to the house. They actually saw the white SUV. There were tire tracks to the backyard, which were consistent with what he was telling them about people going to the house and picking up marijuana. They showed him a picture from an Internet that was shown to the driver. He said that was the residence. They checked computer records for the change of address. They checked on the address of the owner. They contacted another CS. They contacted Dave Ryans of the South Bend Police Department and, in fact, got information about the reliability of the informant. So they did a number of things in trying to make sure that what they were getting from this informant, at least, was accurate, and so when the issuing judge had all of this information and it was single-spaced. I remember when I first saw the affidavit. It's long, it's detailed, and it never says, yeah, I was there and I saw it. Right? Well, not in those specific words, but a fair, common-sense reading of that particular affidavit. Interesting, because when I'm sitting down having a cup of coffee this morning, rereading the affidavit about the hundredth time, I notice that the word prior is used by the affiant in Paragraph 3 and then Paragraph 5, and that was sort of an epiphany to me, that the language used by the affiant was that the informant had been there prior to being stopped. And then the affiant also uses the word prior in Paragraph 5 and says prior to the informant being taken off to jail. So I guess from that standpoint, if we looked within the four corners of the affidavit, the two times that the word prior appears, it seems to be a recent event. Well, that tells us about recency, but it doesn't tell us whether he knows this from what somebody else has told him or what I would have expected is, I guess what we're used to seeing, is I was in the house. Well, the driver indicated that he was at Olivo's residence prior to being pulled over. That's in Paragraph 3, Your Honor. So I do think that's in there, but I think, listen, I've yet to see the perfect affidavit. I think that in terms of, and is this ideal, can there be more clarity? Obviously, on Monday morning, as a quarterback, we could say, yeah, there should be some more clarity, but is it there? Yes. Yeah, we're professional Monday morning quarterbacks here. Are there any additional questions that I can answer for the court? With that, we would ask the court to affirm the decision of Judge DiGiulio in denying the motion to suppress. Thank you. How much time do we have left? Any questions? All right, thank you. We'll take the case under advisement.